IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DEBRA D. PATSIOS,<br><br>    Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,<br><br>    Defendant. | 4:13-CV-3134<br><br>MEMORANDUM AND ORDER |

   This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Debra D. Patsios' application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Court has considered the parties' filings and the administrative record. For the reasons discussed below, the Commissioner's decision is reversed and remanded for further proceedings consistent with this opinion.

I. P&#x1d07;&#x1d0f;&#x1d04;&#x1d07;&#x1d05;&#x1d1c;&#x1d0b;&#x1d00;&#x029f; B&#x1d00;&#x1d04;&#x0262;&#x0280;&#x1d0f;&#x1d1c;&#x0274;&#x1d05;

   Patsios applied for disability insurance benefits in June 2010. T51, 118.[1] Her claim was denied initially and on reconsideration. T51–69. Patsios appealed and requested a hearing before an administrative law judge (ALJ). T72–73. The ALJ held a hearing on January 30, 2012. T27–50. In a decision dated April 16, 2012, the ALJ found that Patsios was not disabled as defined under 42 U.S.C. §§ 416(i) or 423(d), and therefore not entitled to benefits. T11–21.

   Disability, for purposes of the Social Security Act, is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 416(i) & 423(d).

   To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). At

---

[1] All citations to the administrative record (filings 16 through 16-10) are given as "T [Transcript]" followed by the page number.

step one, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). If the claimant has engaged in substantial gainful activity, she will be found not to be disabled; otherwise, at step two, she has the burden to prove she has a medically determinable physical or mental impairment or combination of impairments that significantly limits her physical or mental ability to perform basic work activities. *Id.*

At step three, if the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, she is automatically found disabled and is entitled to benefits. *Id.* Otherwise, the analysis proceeds to step four, but first, the ALJ must determine the claimant's residual functional capacity (RFC), which is used at steps four and five. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is what she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). At step four, the claimant has the burden to prove she lacks the RFC to perform her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do her past relevant work, she will be found not to be disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.; Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

Patsios alleged disability primarily as a result of depression and bipolar disorder.[2] T13, 51, 53. She alleged a disability onset date of June 24, 2009. T118. The ALJ found that, based on her earnings record, Patsios could remain insured through December 31, 2014. Thus, the question before the ALJ was whether Patsios had demonstrated that she was disabled for some period of not less than 12 months from between June 24, 2009 to December 31, 2014.

At step one, the ALJ found that Patsios had not engaged in substantial gainful activity following her alleged onset date. Next, at step two, the ALJ found that Patsios' bipolar disorder and depression were medically determinable, severe impairments. At step three, the ALJ found that Patsios' conditions did not meet or medically equal a listed impairment. T13–15.

---

[2] Patsios also experiences problems with her left shoulder. T13, 51, 53. The ALJ accounted for this in determining Patsios' RFC, and Patsios does not argue that the ALJ erred in this aspect of the decision. So, the Court will not discuss Patsios' shoulder condition or the ALJ's associated findings in any detail.

The ALJ then determined that Patsios had the RFC to perform medium work, except that she was limited to simple, routine, repetitive tasks requiring occasional interaction with the public. T15. At step four, the ALJ found, based upon interrogatories submitted to a vocational expert ("VE"), that Patsios lacked the ability to perform her past relevant work. The VE stated that Patsios could not perform her past work as a machine operator because of her shoulder, and could not perform any of her other past work because the positions all involved more than occasional interaction with the public. T19–20, 260. However, at step five, the ALJ found that Patsios could perform other jobs that existed in significant numbers in the national economy. T20–21. This was based on the VE's statement that an individual with Patsios' RFC could perform the representative jobs of lab equipment cleaner, meat checker, and counter supply worker. T261. So, the ALJ found that Patsios was not disabled. T21.

On May 16, 2013, after receiving additional evidence (T275–83, 455–85), the Appeals Council of the Social Security Administration denied Patsios' request for review. T1–4. Patsios' complaint (filing 1) seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Bernard v. Colvin*, 774 F.3d 482, 486 (8th Cir. 2014). Where, as here, the Appeals Council denies review of an ALJ's decision after reviewing new evidence, the Court does not evaluate the Appeals Council's decision to deny review, but rather determines whether the record as a whole, including the new evidence, supports the ALJ's determination. *McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013). In such cases, the Court must evaluate how the ALJ would have weighed the new evidence had it existed at the initial hearing. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000).

Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Bernard*, 774 F.3d at 486. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Id.*; *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Bernard*, 774 F.3d at 486.

# III. FACTUAL BACKGROUND
## A. Patsios' Prior Mental Health History and the Alleged Onset Date

Patsios' claim for benefits, and her arguments on appeal, are addressed primarily at her depressive symptoms. Patsios has a long history of depression. On her alleged onset date, she was 53 years old. T32. Patsios experienced her first depressive episode when she was a teenager, and these have occurred off and on for her entire life. She also has a history of hospitalization for depression and thoughts of suicide, beginning as a teenager and later in 1997 and 1999. T284, 312. From about 1997 to 2001, Patsios received Social Security disability benefits due to her depression. T34, 129, 285.

Eventually Patsios' condition improved, and she was able to return to work. T312. From approximately 2002 to 2009, she worked in a variety of positions. Patsios worked part-time as a pizza delivery driver from late 2002 to early 2003, and thereafter worked more or less full-time as a machine operator, convenience store cashier, and retail customer service manager. T151, T215–24.

At the hearing before the ALJ, Patsios explained why she selected a disability onset date of June 24, 2009. At that time, a back surgery that went wrong left Patsios' husband paralyzed from the waist down, and she took family medical leave from her job to help him. T33, 35. Patsios explained that, around that time, she began to experience "deep depression" and felt that she "just couldn't handle everything anymore" and "was having a lot of trouble dealing with everything." T35, 150. Eventually, her family medical leave ran out, and she did not return to her job. She tried working again in January 2010 as a bookkeeper, but she was fired after about 2 months because she was unable to "remember and do the job." T13, 35, 312.

## B. Patsios' Symptoms and Activities of Daily Living

At the hearing before the ALJ, Patsios described the impact of her mental illness on her ability to function. Her testimony generally matched her reports to treatment providers for the period under consideration. Patsios explained that she had little energy, could not maintain focus or attention, and was forgetful. T31, 40–42, 312. She cried easily and felt depressed most days out of a month. T40–41. Patsios stated that she had mood swings which made her irritable, and she generally wanted to stay away from other people. T40–41, 230. And she experienced thoughts of suicide once or twice a month. T41.

Patsios also described her daily activities. Again, this testimony mirrored her responses in disability questionnaires submitted throughout the period under consideration. Patsios was the primary caregiver for her

grandson, who was 9 years old at the time of the hearing. T32, 284, 311. Caring for him involved making him breakfast and getting him ready for school, then helping with his homework at night, making dinner, and getting him ready for bed. T39–40. Patsios cooked simple meals and performed basic household chores. T226. Patsios' husband had a caregiver who helped him during the day, but Patsios helped him overnight. T12, 40, 361. Although she went grocery shopping, she had help, and she also received help making sure she took her medications properly. T282, 440. She did not engage in any social activities, although, as discussed below, she participated in mental health day services at Goodwill Industries about twice a week. T226. Patsios liked to crochet and quilt, and would do so for about 1 hour a day. T37, 228. Otherwise she would watch television for 4 to 6 hours a day. T37, 228.

### C. Medical and Disability Records: 2010 Through 2012

In April 2010, Patsios began receiving mental health treatment. She received medication management on a monthly basis from Linda Berry, APRN, and attended counselling with a therapist twice a month.[3] T45, 284, 312. Prior to her first visit with Berry, Patsios had not been taking any psychotropic medications for the preceding 4 years. And although she had previously met with a psychiatrist, she had also not seen him in the preceding 4 years. T284, 312.

Patsios told Berry that her depression had worsened in the past 2 to 3 months and reported experiencing fatigue, sadness, decreased motivation and interest, and low energy. T284. Upon mental status examination, Berry noted that Patsios' memory was intact, she was alert and oriented, and maintained fairly good eye contact, but that Patsios was tearful, her mood was depressed, and her affect was flat. T286. Berry diagnosed Patsios with Bipolar I Disorder, most recent episode depressed, and rated her Global Assessment of Functioning (GAF) as 50.[4] T286. From April 2010 until June 2010, Berry

---

[3] The record does not include any notes from Patsios' therapist.

[4] A GAF is "the clinician's judgment of the individual's overall level of functioning," not including impairments due to physical or environmental limitations. *See* American Psychiatric Association*, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereinafter, "*DSM-IV-TR*"). The GAF scale is divided into ten ranges of functioning, from 0 to 100, with a score of 100 representing superior functioning. *Id.* at 32–34. A GAF of 41 to 50 signifies serious symptoms, such as thoughts of suicide, or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV-TR* at 34.

continued to assess Patsios' GAF as 50. But in August, she raised it to 55 to 60.[5] T367–70.

From April 2010 through the remainder of the period for which records are available (until April 2012), Patsios met with Berry on roughly a monthly basis. Throughout that period, Berry prescribed Patsios various combinations and dosages of psychotropic medications, including anti-depressants and mood stabilizers, in an effort to find a medication regime that would control Patsios' symptoms without causing unmanageable side effects. *See* T285, 359–70, 430–64.

Throughout that same period, Patsios continued to attend twice-monthly therapy sessions with the same counselor. T45, 312. Patsios also attended day services at Goodwill Industries. T312, 412. This involved working in small groups to address her depression and to overcome her tendency to isolate herself from other people. T37. At first, her communication and participation were minimal and she was noted to have a negative attitude. T421–22. But she attended an average of 2 days a week from 2010 to 2012. T412. And as time progressed, she was noted to be participating well in the treatment and working toward recovery. T412–15.

In August 2010, Patsios met with Krista K. Fritson, Psy.D, for a consultative examination. Patsios described similar symptoms of depression, such as an inability to focus. She also reported feelings of anxiety, and that she often felt overwhelmed due to financial stressors and her inability to work. T312. Upon mental status examination, Fritson noted that Patsios' mood appeared to be depressed and her affect was congruent. But the examination was otherwise essentially normal. For example, Patsios was able to communicate effectively and had good eye contact, and there was no sign of memory impairment. T313. Like Berry, Fritson diagnosed Patsios with Bipolar I Disorder. T314. But in contrast to Berry, who rated Patsios' GAF as falling between 50 and 60, Fritson assigned a GAF of 40.[6] T314. Additionally, Fritson provided an assessment of Patsios' ability to work, which the Court will discuss in greater detail below.

From September 2010 to January 2011, Patsios continued her meetings with Berry. Berry continued to adjust Patsios' medications, but Patsios continued to report similar symptoms of depression. Throughout this period,

---

[5] A GAF of 51 to 60 signifies moderate symptoms or moderate difficulty in the same areas of functioning (e.g., few friends, conflicts with peers or coworkers). *DSM-IV-TR* at 34.

[6] A GAF of 40 is associated with some impairment in reality testing or communication or a "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . )." *DSM-IV-TR* at 34.

Berry assessed Patsios' GAF as 55 to 60. T359–65. In January 2011, Patsios reported she was not attending services at Goodwill and was isolating herself from her family. She rated her depression as 7 out of 10 and was experiencing some thoughts of suicide. T359.

In February 2011, Patsios was voluntarily admitted for 5 days' inpatient treatment, due to worsening depression and thoughts of suicide. Patsios stated that her medications were not helping. She reported that she was extremely anxious and felt overwhelmed taking care of her husband and grandson, that she was unable to focus, and there were many days where she could barely do anything. T371–72, 377. The day after she was admitted, Patsios met with Ahsan Naseem, M.D., who assessed her GAF as 30 and noted that Patsios exhibited avoidant eye contact, deficits in concentration and attention; and was slow to respond to questions.[7] T373. During her discharge several days later, she met with Kavir Saxena, M.D., who noted that Patsios was "fairly stable," but that she had "struggle[ed] with depression and feeling[s] of being out of control and overwhelmed" throughout her stay in the hospital. T371. At discharge, Saxena rated Patsios' GAF as 50. T371.

Patsios met with Berry again in May 2011 and reported that she was "seeing some light at the end of the tunnel" and was not feeling quite as sad. T452. Berry assessed her GAF as 50 and continued to work with her to find a combination of medications that worked. T451–52. However, on June 9, 2011, Patsios was placed in emergency protective custody and hospitalized for about 2 weeks after she attempted suicide by overdosing on one of her prescriptions. T389–90, 397. She reported symptoms similar to her last admission. T399. On June 13, she met with Hugo Gonzalez, M.D., who assessed her GAF as 25. T400. At discharge, Patsios was noted to be calm, cooperative, and compliant with her medications, and Gonzalez rated her GAF as 65.[8] T397.

When Patsios next met with Berry in July 2011, Berry tried prescribing a different anti-depressant, Effexor (venlafaxine). T448–49. From then until the hearing before the ALJ in January 2012, Patsios continued to take

---

[7] A GAF of 21 to 30 signifies serious impairment in communication or judgment, such as suicidal preoccupation, or "inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *DSM-IV-TR* at 34.

[8] A GAF of 61 to 70 signifies that while a person has some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social or occupational functioning, they are "generally functioning pretty well" and have "some meaningful interpersonal relationships." *DSM-IV-TR* at 34.

Effexor, although the dosages were adjusted. Berry also continued to adjust Patsios' separate mood-stabilizing medications. *See* T430–56. Through September 2011, Berry continued to rate Patsios' GAF as 50, and noted on mental status examination that while she was pleasant and cooperative and maintained good eye contact, she had a depressed mood and flat affect. T439–49. Beginning in October, however, Patsios began to report some improvement in her depressive symptoms and mood stability, which continued through December 2011. And for the first time, Berry noted that Patsios' mood was either mildly depressed or neutral, with an affect that was neutral or within normal limits. T432–37. However, in two January 2012 visits to Berry, Patsios again reported increased depression and mood lability. T430–31, 455–56. Throughout this period, Berry continued to rate Patsios' GAF as 50. T430–37, 455–56. On January 26, 2012, shortly before the hearing before the ALJ, Berry filled out a "Medical Source Statement" in which she gave her opinion of Patsios' condition and level of functioning. T424. Berry's opinion will be discussed in greater detail below.

Following the hearing before the ALJ, Patsios submitted several new records to the Appeals Council. These include several more notes from visits to Berry. These notes show that through February and March 2012, Patsios continued to report increased depression. But in April, Patsios showed improvement, denying depression and stating that her mood had improved. 458–64. Throughout this period, Berry continued to rate Patsios' GAF as 50. T458–64.

## IV. ANALYSIS

The ALJ found that Patsios had the RFC to perform medium work, except that she was limited to simple, routine, repetitive tasks requiring occasional interaction with the public. T15. In arriving at this determination, the ALJ afforded "great weight" to Fritson's August 2010 opinion. T19. Conversely, the ALJ gave "no weight" to Berry's January 2012 opinion. T19. Patsios argues that the ALJ erred in rejecting Berry's opinion. As a result, Patsios contends, the ALJ failed to incorporate all of the limitations caused by her impairments into her RFC, thereby undermining the ALJ's step five finding that Patsios was able to perform other work.

The Court has carefully reviewed the record as a whole and the ALJ's reasoning for discounting Berry's opinion. The Court finds that the ALJ's reasoning does not find substantial support in the record and that the ALJ erred in entirely rejecting Berry's opinion. Similarly, the Court finds errors in the ALJ's broader determination of Patsios' RFC. Therefore, this case will be remanded for further consideration. The Court begins its analysis with an examination of Fritson's and Berry's opinions.

### A. Fritson's August 2010 Opinion

In assessing Patsios' then-current functioning, Fritson wrote that Patsios should be able to maintain social functioning and relate appropriately to others, and remember and carry out simple and complex instructions under normal supervision; that she had adequate concentration and attention, and that she would not have difficulty adapting to changes in life or structure. T313. Despite these generally positive comments, Fritson assessed Patsios' current GAF as 40 and gave the following prognosis:

> Prognosis is guarded for Debra from a mental health standpoint. She appears to have significant depressive symptoms that affect her daily functioning and ability to maintain duties of employment and relationships consistently. Her history of depression and mania suggest that her symptoms exacerbate under stress and she is likely having another episode of major depression, though no mania is currently evident. Debra has been responsive to treatment in the past to the point she was fully employed for a few years, and she is motivated to feel better again. Continued [d]ay [t]reatment, support and psychotherapy are recommended.

T314.

Fritson also responded to a brief questionnaire asking various "yes" or "no" questions related to Patsios' ability to work. T315. Fritson wrote that Patsios had restrictions in her activities of daily living, in that she had low energy and motivation and felt too overwhelmed and tired to complete everyday tasks. Fritson again noted that Patsios' symptoms would deteriorate under stress, and stated that her symptoms had worsened since her husband's paralysis. And Fritson found that while Patsios had some irritability, she could relate appropriately to coworkers and supervisors, she could sustain concentration and attention for task completion, and she could understand and carry out short and simple instructions under normal supervision. T315.

### B. Berry's January 2012 Opinion

In a January 26, 2012 "Medical Source Statement," Berry gave her opinion of Patsios' condition and level of functioning. By that time, Berry had met with Patsios about 16 to 20 times, over the course of their more-or-less monthly meetings since April 2010. T424. Berry assessed Patsios' current GAF as 50, which Berry also rated as her highest GAF for the past year. T424. The remainder of the form reflected Berry's findings not for Patsios'

current functioning, but for the entire period of their treatment relationship. T424.

Berry noted that Patsios had exhibited the following signs and symptoms: appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, pervasive loss of interests, feelings of guilt or worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, flat affect, decreased energy, manic syndrome, and irritability. T424–25. Berry stated that Patsios had achieved "moderate" control of her disorder with her medications, but that she nonetheless had moderate restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate deficiencies in concentration, persistence, or pace. T426.

In another portion of the form, Berry rated Patsios' ability to do work-related activities on a day-to-day basis in a regular, full-time work setting. The form used ratings ranging from "unlimited or very good," to "good," "fair," and "poor or none." T427. "Good" was defined as a limited but satisfactory ability to function. "Fair" meant that an ability to function was "seriously limited, but not precluded." And "poor to none" meant that there was "[n]o useful ability to function." T427.

Berry rated as "good" Patsios' abilities to understand, remember, and carry out very short and simple instructions, and to work in coordination with or proximity to others without being unduly distracted. Berry rated as "unlimited or very good" Patsios' abilities to ask simple questions or request assistance and to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes. Berry assessed as "fair" Patsios' abilities to interact appropriately with the general public, maintain socially acceptable behavior, and function independently. T428–29.

But Berry rated as "poor or none" Patsios' abilities to maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace; accept instructions and respond to criticism from supervisors; respond appropriately to changes in a routine work setting; and deal with normal work stress. And Berry opined that Patsios similarly had poor or no ability to handle detailed instructions and deal with the stress of semiskilled and skilled work. T428–29.

### C. The ALJ's Reasoning

The ALJ credited Fritson's findings that Patsios could carry out short and simple instructions and relate appropriately to coworkers and supervisors. T19. These findings, the ALJ explained,

> are consistent with [Fritson's] examination report that indicated the claimant had only moderate limitations in her mental health functioning. They are consistent with the fact that [Patsios] provides care for her grandson, which indicates she is capable of completing tasks and having some social interaction. They are consistent with [Patsios'] report that she does some household chores, which indicates she is capable of completing simple tasks. Therefore, these opinions are afforded great weight.

T19. The ALJ acknowledged that Fritson had found some restrictions in social functioning, activities of daily living, and episodes of deterioration, but that these did not keep Patsios from performing simple, routine, repetitive tasks with no more than moderate limits in social functioning. T19.

In weighing Berry's opinion, the ALJ stated:

> NP [Nurse Practitioner] Berry opined that the claimant had significant limitations in several areas of mental functioning. An advanced practicing registered nurse is not an acceptable medical source under Social Security Regulations . . . . Furthermore, these opinions are inconsistent with the GAF score of 65 assessed when the claimant was discharged from inpatient treatment in June 2011 (Exhibit B15F). They are inconsistent with her daily activities that include caring for her grandson and performing household chores, which show[] she can concentrate to complete tasks and she can have social interaction. Therefore, these opinions are afforded no weight.

T19.

### D. Berry's Status As an "Other Source"

As the ALJ noted, Berry was an APRN, and therefore not what Social Security regulations refer to as an "acceptable medical source." Social Security regulations distinguish between "acceptable medical sources," and "other sources" which, in turn, include medical and non-medical sources. *Sloan v. Astrue,* 499 F.3d 883, 888 (8th Cir. 2007); 20 C.F.R. §§ 404.1502, 404.1513(a), (d). Acceptable medical sources include, among other things,

- 11 -

licensed physicians and licensed or certified psychologists. *Sloan*, 499 F.3d at 888; 20 C.F.R. § 404.1513(a). As to "other sources," medical sources include, *inter alia*, physician assistants and nurse practitioners, and non-medical sources include welfare agency personnel, family, friends, and neighbors. *Sloan*, 499 F.3d at 888; 20 C.F.R. § 404.1513(a).

While other sources cannot establish the existence of a medically determinable impairment, they may "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Social Security Ruling ("SSR") 06-03p, 71 Fed. Reg. 45593-03, 2006 WL 2263437 (Aug. 9, 2006).[9] In SSR 06-03p, the Social Security Administration acknowledged that with the growth of managed health care and emphasis on containing medical costs, medical sources who are not acceptable medical sources play an increasing role in treating and evaluating claimants. *Id*. Opinions from these sources are "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id*.

Opinions from other medical sources should be evaluated using the same factors used to evaluate opinions from acceptable medical sources, set forth in 20 C.F.R. § 404.1527(c). SSR 06-03p, 71 Fed. Reg. at 45595. These factors include the length of treatment relationship and frequency of examination, the nature and extent of the treatment relationship (e.g., the treatment the source has provided and the kinds and extent of examinations and testing the source has performed or procured), supportability of the opinion with evidence and explanation, consistency of the opinion with the record as a whole, and the specialization of the source, as well as any other relevant factors. 20 C.F.R. § 404.1527(c). Although these factors are useful, they are not binding on the ALJ, who has greater discretion in dealing with opinions from other sources. *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006).

> However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example,

---

[9] SSRs do not carry the force of law and are not binding on courts, but courts generally afford them deference as long as they are consistent with the Social Security Act and its regulations. *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also Ingram v. Barnhart*, 303 F.3d 890, 894 (8th Cir. 2002). However, SSRs are binding upon ALJs and all components of the Social Security Administration. *Grebenick v. Chater*, 121 F.3d 1193, 1200 (8th Cir. 1997); 20 C.F.R. § 402.35(b)(1).

> it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

SSR 06-03p, 71 Fed. Reg. at 45596.

### E. The ALJ Erred in Evaluating Berry's Opinion and in Determining Patsios' RFC

The ALJ gave several reasons for giving Berry's opinion no weight. However, the reasons do not stand up to review, and do not find substantial support in the record. This is not to say that the ALJ necessarily erred in refusing to give Berry's opinion controlling weight—rather, on the record before the Court, the ALJ's reasoning does not support her decision to entirely reject Berry's opinion.

The ALJ first noted that Berry's assessment was inconsistent with the GAF score of 65 that Patsios received in June 2011 after being discharged from inpatient treatment. This observation is problematic. First, that score was assessed after Patsios had been receiving in-patient treatment for approximately 2 weeks, during which time she had been insulated from the stressors that prompted her suicide attempt in the first place. *See* T399. In addition, this observation overlooks the fact that Berry's opinion could just as easily be seen as consistent with the GAF of 40 assessed by Fritson, whose opinion the ALJ afforded "great weight." Moreover, Berry's assessment was internally consistent with her repeated examinations of Patsios and her consistent rating of Patsios' GAF in the 50s. Berry's opinion, based on a long-term treating relationship, cannot be discredited by cherry-picking a single score from a provider who met Patsios once under unique circumstances.

In fact, Berry's opinion was generally consistent with Fritson's opinion. Like Fritson, Berry opined that Patsios could perform simple work, could work in coordination with others, and could get along with coworkers and peers. T315, 426. And Berry's opinion that while Patsios had serious limitations, she was not precluded from interacting with the general public, is similar to the ALJ's assessment that Patsios could have occasional interaction with the public. T15, 429.

The most striking findings in Berry's opinion go to Patsios' ability to consistently maintain her focus and ability to work, such as the ability to complete a normal day and week of work without interruptions from psychological symptoms, and the ability to deal with normal work stress. T428. These findings address a key aspect of the disability inquiry—whether

the claimant can perform the functions of work "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Boettcher v. Astrue*, 652 F.3d 860, 866 (8th Cir. 2011).

Fritson was not asked to opine on these specific functional abilities. But on this point too, Fritson's opinion is consistent with Berry's. For example, Fritson found that Patsios experienced "recurrent episodes of deterioration when stressed." T315. And Fritson concluded that Patsios was likely in the grip of an "episode of major depression" that caused "significant depressive symptoms that affect her daily functioning and ability to maintain duties of employment and relationships *consistently*." T314 (emphasis supplied). Fritson acknowledged that Patsios had "been responsive to treatment in the past to the point she was fully employed for a few years," but her current recommendation was to continue with day treatment. T314. Read in context, this suggests that Fritson believed, at least as of August 2010, that Patsios was not capable of returning to work. Given the overall consistency between the opinions of Fritson and Berry, the ALJ did not adequately explain why she gave great weight to the opinion of Fritson, who saw Patsios only once, but gave no weight to the opinion of Berry, who saw and treated Patsios numerous times over a span of nearly 2 years.

The ALJ also found that Berry's opinions were inconsistent with Patsios' activities of daily living, reasoning that Patsios' ability to care for her grandson and perform household chores showed she could concentrate to complete tasks and have social interaction. The Court is not entirely persuaded that the ability to care for one's own grandson translates into an ability to function well with the public, coworkers, and supervisors. But that is not the main thrust of Patsios' claim or Berry's opinion. Berry did not place significant social limitations on Patsios, with the exception that she believed Patsios could not accept instructions and respond appropriately to criticism from supervisors. T428. Rather, the most significant findings in Berry's opinion were that Patsios would have difficulty maintaining her ability to function in the normal stress of a work environment. The Court is not convinced that the daily activities cited by the ALJ undermine those findings.

Taking care of children and running a household may, or may not, be inconsistent with a finding of disability, or with a lack of certain functional abilities. But that depends on the facts of the case. Patsios was not taking care of several pre-kindergarten children and keeping a large house spotless. She was caring for one 9-year-old and having trouble keeping up with the chores. Patsios described her child care duties as getting her grandson ready for school, making him breakfast, helping with homework, making dinner, and getting him ready for bed. T39–40. For most of the day, however, her grandson would be in school. This does not approach the demands of

performing work 8 hours a day, 5 days a week. Patsios had help during the day caring for her husband, and the record does not show what caring for him at night involved other than getting up occasionally to help him use the bathroom. T440. Patsios also described her house cleaning. At least in 2010, her house was quite small. T182. She would clean "maybe two times a week if lucky." T226. She did dishes every other day. T226. And she prepared meals, but this involved "quick and repeat meals that [were] easy" to make. T226. These sorts of activities do not contradict Berry's finding that Patsios would have difficulty working consistently, and they certainly provide little support for a finding that Patsios could perform full-time competitive work. *See, e.g.*, *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998).

The ALJ's consideration of Patsios' daily activities was, of course, entirely proper. And those activities could be viewed as inconsistent with certain aspects of Berry's opinion—for example, her finding that Patsios could not maintain attention for a 2-hour segment. T428. But given the lack of other reasons to discredit Berry's opinion, and its consistency with Fritson's opinion, this alone does not provide a reasonable basis for entirely rejecting Berry's opinion, especially when the factors set forth in 20 C.F.R. § 404.1527(c) are considered. Berry had a long-term treatment relationship with Patsios that spanned most of the period under consideration. Berry observed Patsios on multiple face-to-face visits, and she was the only source in the record who saw Patsios more than once. Berry was familiar with the effects of various medication on Patsios' symptoms. And Berry's opinion was, as the Court has discussed, consistent with much of the record. In short, the Court finds that the ALJ erred in entirely rejecting Berry's opinion. This is not to say that the ALJ was bound to give Berry's opinion controlling weight—but the reasons provided by the ALJ do not support a decision to give Berry's opinion no weight. And this error is linked, in turn, to the ALJ's broader determination of Patsios' RFC, and the ALJ's finding that Patsios' symptoms were not as debilitating as Patsios alleged. Here too, the Court finds the ALJ's reasoning unpersuasive.

The ALJ noted that since July 2011, Patsios had been maintained on Effexor. This, the ALJ reasoned, showed that Patsios "received adequate control of her symptoms with this medication." T17. There are two problems with this reasoning. First, it overlooks the fact that Berry had to adjust the dosage of Effexor, in response to Patsios' complaints that it was not working, *see* T437, 459, but also the fact that from July 2011 to January 2012, Berry prescribed five different mood stability drugs in unsuccessful attempts to treat Patsios' mood stability and episodes of mania. *See* T431, 433, 435, 440, 443, 446. Second, the ALJ's reasoning would just as readily imply that for the period prior to July 2011, Patsios was not receiving adequate control of her

symptoms. And Berry's notes from that period confirm that Berry was continually adjusting Patsios' medications in unsuccessful attempts to find a combination that worked. *See* T359–70. Perhaps Patsios did achieve adequate control of her symptoms with Effexor. But to receive benefits, she does not have to show that she was disabled for the entire period under consideration, only a continuous period of not less than 12 months.

The ALJ also reasoned that the record did not contain

> any medical observations, by any treating psychiatrist or psychologist, of significant abnormalities or deficits with the respect to the claimant's mood, affect, thought processes, concentration, attention, pace, persistence, social interaction, activities of daily living, speech, psychomotor activity, focus, contact with reality, eye contact, orientation, demeanor, abilities to cope with stress, abilities to work without decompensation, abilities to understand and follow instructions, judgment, insight, cognitive function or behavior, lasting twelve months in duration, and despite strict compliance with prescribed treatment.

T17–18.

But Patsios did not have a treating psychiatrist or psychologist. She received treatment from Berry and therapy from Kristy Judds, who was an LMHP. T45, 154, 198. And the record strongly suggests that Patsios could not afford further treatment. T45, 435, 443, 449. So, she can hardly be faulted for failing to obtain a treatment provider with the highest credentials. As for medical observations, Berry consistently noted in her mental status examinations that Patsios had a depressed mood and flat affect. *See, e.g.*, T286, 359–70, 439–52. It was only when Patsios began to report somewhat consistent improvement, in late 2011, that Berry began to record Patsios' mood as "mildly depressed" and her affect as either "neutral" or "within normal limits." *See* T432–37. And Fritson, whose opinion the ALJ found persuasive, opined that Patsios' ability to cope with stress was impaired. T314–15. Further objective support is found in Patsios' two admissions for in-patient treatment, prompted by feelings of overwhelming stress and depression, where she was observed by three different M.D.'s to be suffering from very serious depressive symptoms. *See* T371–72, 377, 400.

As the ALJ recognized, Patsios' "fairly good work history" enhanced her credibility. T18. But this was not the only reason to find Patsios credible. Patsios' reports of her symptoms were consistent over time and across providers. Fritson believed that Patsios was "motivated to feel better again." T314. Fritson recommended that Patsios continue with day treatment and

psychotherapy. T314. And that is what Patsios did—she attended therapy, as well as day services with Goodwill, and she worked with Berry to find medications that would help her symptoms.

That leaves the opinions of the state agency medical consultants. In September 2010, one consulting psychologist submitted two forms in which she generally opined that Patsios retained the ability to perform work that was simple, routine, and unskilled. *See* T19, 324–25. Another consulting psychologist affirmed these findings without comment in March 2011. T387. The ALJ was, of course, entitled to consider and rely upon these reports. *See Vossen v. Astrue*, 612 F.3d 1011 (8th Cir. 2010). But generally speaking, the opinions of consulting professionals who examine a claimant once or not at all do not constitute substantial evidence on the record as a whole. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). That rule holds true here. These opinions, rendered early in the period under consideration and without the benefit of a full record or any contact with Patsios, do not provide a basis for affirming the ALJ's ultimate findings.

In sum, the Court is unpersuaded by the ALJ's reasoning regarding the severity of Patsios' symptoms. Together with the improper consideration of Berry's opinion, this undermines the Court's confidence in the ALJ's determination of Patsios' RFC. And that may have made a difference at step five—the VE found that, if Berry's findings were credited, Patsios would not be able to perform her past work or any other jobs existing in significant numbers in the national economy. T248–49, 264. In light of the record before it, the Court cannot say that these errors were harmless, i.e., that the ALJ would inevitably have reached the same result if she had properly evaluated Berry's opinion and the extent and effects of Patsios' symptoms. *See, e.g.*, *Ford v. Astrue*, 518 F.3d 979, 982–83 (8th Cir. 2008); *Dewey v. Astrue*, 509 F.3d 447 (8th Cir. 2007). This case will therefore be remanded for further proceedings consistent with this Memorandum and Order. On remand, the Commissioner should reevaluate Berry's opinion and reconsider Patsios' RFC in light of the factors discussed above.

THEREFORE, IT IS ORDERED:

1. This case is reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

2. A separate judgment will be entered.

Dated this 4th day of March, 2015.

BY THE COURT:

John M. Gerrard
United States District Judge

- 18 -